# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 20, 2021          Decided August 16, 2022

No. 20-5183

LISA GUFFEY AND CHRISTINE SMITH,
APPELLEES

v.

ROSLYNN R. MAUSKOPF, IN HER OFFICIAL CAPACITY AS
DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED
STATES COURTS,
APPELLANT

Consolidated with 20-5208

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-01271)

*Weili J. Shaw*, Attorney, U.S. Department of Justice, argued the cause for appellant/cross-appellee. With him on the briefs were *Brian M. Boynton,* Acting Assistant Attorney General, and *Scott R. Mcintosh*, Attorney.

*Scott Michelman* argued the cause for appellees/cross-appellants. With him on the briefs was *Arthur B. Spitzer.*

Before: HENDERSON and WALKER, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

Dissenting opinion by *Circuit Judge* HENDERSON.

WALKER, *Circuit Judge*: Lisa Guffey and Christine Smith work at the Administrative Office of the United States Courts. When they are away from work, they want to express support for their preferred candidates in partisan elections.

AO employees could do that for the first 79 years of the agency's history. But since 2018, the AO has forbidden it.

That prohibition violates the Free Speech Clause of the First Amendment.

## I

We begin with some background on the Administrative Office, the work that Guffey and Smith do there, the AO's speech restriction, and the district court proceedings.

## A

Congress created the AO in 1939. Pub. L. No. 76-299, 53 Stat. 1223 (Aug. 7, 1939). It is now an 1,100-employee agency within the Judicial Branch that provides a variety of valuable support services. For example, its employees:

- Assist judges and courthouse staff with information technology;

- Help courts connect with visiting judges and coordinate travel;

- Handle human resources and other support tasks for courts, probation offices, and federal-defender services;

- Recommend positions to the Judiciary's internal policymaking body, the Judicial Conference, on issues like codes of conduct, court administration, and defender services;

- Issue press releases and statements on behalf of the Judiciary;

- Advise judges on reimbursements, recusals, gifts, and other ethics issues; and

- Represent the Judicial Conference before Congress and the Executive Branch.

That far-from-exhaustive list shows the array of important tasks that AO employees handle. But note what is not on that list. AO employees do not decide cases — only judges do that. Nor do they make recommendations about the outcomes of individual cases, as law clerks and other legal advisors inside a courthouse often do.

B

When this case began, Guffey and Smith worked with the AO's Defender Services Office. Guffey still does, but Smith has since moved to the AO's Department of Technology Services.

Guffey makes sure that individual federal-defender offices and court-panel attorney programs are adequately resourced, operating effectively, and following administrative policies. That work includes occasional meetings with judges to report

on federal-defender offices and assess court-panel programs. In a decade at the AO she has performed work related to an individual case exactly once, when she researched the appropriate level of funding for expert witnesses without making a recommendation.

Until somewhat recently, Smith was the IT Liaison for the Defender Services Office.  She ensured that federal defenders' IT needs were met and that they had secure systems.  She occasionally met with judges to advance those goals.  In her new role, Smith leads cyber-security assessments.

C

For the first 79 years of the AO's history, its employees have been free to engage in certain partisan political expression outside the office.  Both Guffey and Smith have engaged in partisan political activities away from the job while employed at the AO.  There is nothing in the record to indicate that any such political activity by Guffey, Smith, or any other AO employee has had any adverse impact on the operations or reputation of the AO or the judicial branch.  But despite that history, the AO revised its code of conduct in 2018 to prohibit partisan political expression by its employees, whether done on the clock or on their own time.

As is relevant here, the AO's code of conduct now prohibits:

1. Publicly expressing opinions about partisan candidates or political parties, including on social media;

2. Wearing or displaying partisan badges, signs, or buttons;

3. Contributing money to a party, candidate, or political action committee;

4. Attending partisan fundraisers;

5. Attending a partisan candidate's campaign events;

6. Attending party conventions, rallies, and meetings;

7. Being a member of a partisan political organization;

8. Driving voters to the polls on behalf of a party or candidate; and

9. Organizing events for a partisan candidate.

Those restrictions apply to partisan politics at all levels of government, from a presidential election to a race for the county register of deeds.[1]

D

Guffey and Smith sued the AO, seeking an injunction. They want to be able to continue engaging in certain partisan political expression outside the office — when they are in no way affiliating themselves with the AO. While the suit proceeded, they also moved for a preliminary injunction. *Guffey v. Duff*, 330 F. Supp. 3d 66, 68 (D.D.C. 2018).

The district court granted a preliminary injunction as to the first seven restrictions listed above (all but the restrictions on driving voters to the polls and organizing events). *Id.* at 81. Then, at the summary-judgment stage, the district court granted

---

[1] *See* Emily Patrick, *All About the Register of Deeds Race in the Upcoming Election*, Citizen Times (Oct. 11, 2016), https://www.citizen-times.com/story/news/local/2016/10/11/all-register-deeds-race-upcoming-election/91898522/ (describing the heated, partisan register of deeds race in a North Carolina county).

Guffey and Smith partial summary judgment and permanently enjoined the same seven restrictions. *Guffey v. Duff*, 459 F. Supp. 3d 227, 232 (D.D.C. 2020). Its injunction covered "all AO employees except the six high-level 'designated employees'" to whom a different set of restrictions applied. *Id.* at 256. It granted the AO summary judgment on Guffey and Smith's challenge to the driving and organizing restrictions. *Id.* at 252.

Both parties appealed their losses.

II

Because the First Amendment prohibits the government from "abridging the freedom of speech," the AO's restrictions on Guffey and Smith's off-duty political speech and activities are unconstitutional. U.S. Const. amend. I.

A

The government has unique interests in its employees' conduct. *See United States v. National Treasury Employees Union*, 513 U.S. 454, 465-66 (1995). Those interests allow it to regulate some of its employees' speech, including even political speech, in ways it could not regulate the general public. *Id.*

But the government cannot condition public employment on the complete surrender of a citizen's First Amendment rights. *Id.* at 465; *see also Janus v. American Federation of State, County, and Municipal Employees*, 138 S. Ct. 2448, 2471 (2018). Instead, the government must justify prospective restrictions on its employees' off-duty speech by showing that the speech's "'necessary impact on the actual operation' of the Government" outweighs the employees' right to speak and the

nation's need to hear them. *National Treasury Employees*, 513 U.S. at 468 (quoting *Pickering v. Board of Education*, 391 U.S. 563, 571 (1968)).[2]

In this case, the weight of AO employees' right to express their political opinions outside the office is considerable. Time and again, the Supreme Court has held that political speech must receive "the highest level of First Amendment protection." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 443 (2015). That's in large part because of "the close connection between our Nation's commitment to self-government and the rights protected by the First Amendment. The First Amendment creates an open marketplace in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298, 308-09 (2012) (cleaned up).

In light of the weight of the employees' interest in political expression, the AO has a "heavy" burden. *National Treasury Employees*, 513 U.S. at 466. It must identify a commensurate threat to its operations that justifies banning its employees' off-duty speech. *Id.* at 475.

---

[2] *Janus* questioned whether the *Pickering* test properly applies to "a blanket requirement" that burdens the speech of many employees, as opposed to the one-employee disciplinary context that *Pickering* presented. 138 S. Ct. at 2472 ("we have acknowledged that the standard *Pickering* analysis requires modification" for blanket rules, and "[t]he end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis"). But it did not formally alter *National Treasury Employees*'s articulation of the basic standard, so that articulation remains controlling.

That threat must be "real, not merely conjectural" — "mere speculation" is not enough. *Id.* (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994)). And as with any application of heightened scrutiny, what it takes to show a real threat "will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391 (2000).

To see the difference between "mere speculation" and a "real" threat, compare *United States v. National Treasury Employees* to *Williams-Yulee v. Florida Bar*. In *National Treasury Employees*, the Supreme Court addressed Congress's novel concern that employees accepting honoraria for writing or speaking would lead them to "misuse or appear to misuse power." 513 U.S. at 472. Because that risk was far from self-evident, Congress needed to provide evidence. *Id.* at 473. It didn't. *Id.* at 472. So the Court decided that Congress's concern could not justify the ban on honoraria. *Id.* at 477. In *Williams-Yulee*, on the other hand, the Court addressed the "regrettable but *unavoidable* appearance that judges who personally ask for money may diminish their integrity." 575 U.S. at 447 (emphasis added). That concern was neither novel nor implausible, so "proof by documentary record" was unnecessary. *Id.*

Finally, even after it has identified a real threat, a government employer may impose only those speech restrictions that are "reasonably necessary to protect the efficiency of the public service" against the threat. *National Treasury Employees*, 513 U.S. at 474.

9

B

The AO posits three threats to justify its prohibitions on employees' political expression outside the office. Each is too speculative to survive the scrutiny required for a regulation of political speech.

1

First, the AO argues that political expression by its employees could undermine the public perception of the Judiciary as an impartial adjudicative body.

That perception is "a state interest of the highest order." *Williams-Yulee*, 575 U.S. at 446 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)). So the AO may take steps "reasonably necessary" to preserve it. *National Treasury Employees*, 513 U.S. at 474. But the connection between that interest and the AO's ban on off-duty speech looks more like the loose connection in *National Treasury Employees* than the narrow tailoring in *Williams-Yulee*.

For starters, in *Williams-Yulee*, the regulation allowed judicial candidates to "discuss any issue with any person at any time." 575 U.S. at 452. It just prohibited them from soliciting campaign contributions and public endorsements. *Id.* at 439. That prohibition was based on the "intuitive" notion that "Judges, charged with exercising strict neutrality and independence, cannot supplicate campaign donors without diminishing public confidence in judicial integrity." *Id.* at 445.

The connection between the AO's speech restriction and the Judiciary's reputation for deciding cases impartially is not as intuitive. Guffey and Smith do not decide the outcome — or even make recommendations about the outcome — of

individual cases. That matters because conduct threatens judges' reputation for impartiality when it threatens judges' reputation for impartially *deciding cases*. *See Williams-Yulee*, 575 U.S. at 445-46 (our authority to decide cases "depends in large measure on the public's willingness to respect and follow" our judgments).

To credit the AO's concern for the perception of judicial impartiality, we would have to assume that the public is aware of the AO. There is nothing in the record to suggest that it is.

But even granting the AO that unlikely premise, we would have to further assume that the public first will learn about the political activity of AO employees like Guffey and Smith and then will lose confidence in judges' adjudication of cases because those employees support a particular candidate on their own time. Those two assumptions are novel, implausible, and unsubstantiated: Even with eight decades of AO history to draw from, the AO has excavated no instance of off-duty political conduct by an AO employee that has injured the Judiciary's reputation. *See Shrink Missouri Government*, 528 U.S. at 391; *National Treasury Employees*, 513 U.S. at 472. That silent record is strong evidence that AO employees can speak on matters of public concern without tarnishing the reputation of the Judiciary.

Without evidence, the AO makes its case for censorship by (1) speculating that AO employees' off-duty speech could be exploited by nefarious foreign actors in novel ways, (2) analogizing its employees' speech to the partisan activities of key investigators at the center of the century's most high-profile investigation of an American president, and (3) conflating judges and AO employees. We'll address each in turn.

First, the AO says that nefarious actors like Russian propaganda agencies could try to attribute AO employees' private political expression to the Judiciary as a whole, in order to falsely characterize the Judiciary as partisan. But that is "mere speculation." *National Treasury Employees*, 513 U.S. at 475. And the speculative prospect of Russian propaganda does not justify censoring the political speech of American citizens. *Cf. United States v. Alvarez*, 567 U.S. 709, 727 (2012) (plurality opinion) ("The remedy for speech that is false is speech that is true.").

Second, the AO speculates that the Judiciary will face accusations of partisan bias like the criticism Special Counsel Robert Mueller's investigative team faced several years ago. But that analogy doesn't work. Mueller's investigators prepared subpoenas,[3] questioned witnesses,[4] advised Mueller on when to bring charges,[5] and drafted conclusions about allegations that could have led to a president's impeachment.[6]

---

[3] Special Counsel Robert S. Mueller, III, U.S. Department of Justice, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election: Volume I of II* 13 (2019) (the Special Counsel's office "issued more than 2,800 subpoenas").

[4] Darren Samuelsohn, *What Mueller's Org Chart Reveals About His Russia Probe*, POLITICO (Nov. 13, 2017), https://www.politico.com/story/2017/11/13/robert-mueller-russia-probe-organization-244789.

[5] *Id.* One lawyer advised on "interpreting federal criminal statutes" and the "special counsel's own boundaries for pursuing" a "case against a sitting president."

[6] Josh Gerstein, *Justice Dept: Mueller Prepared No Reports to Congress*, POLITICO (Feb. 7, 2020), https://www.politico.com/news/2020/02/07/justice-department-mueller-112388 (noting that "the special counsel's team drafted" a report that "[s]ome observers compared . . . [to] impeachment

They wielded the Special Counsel's substantive power, just as judges wield the judicial power, so they were a predictable focus of criticism. It would have been quite unexpected, however, if anyone had attempted to weaponize the political preferences of the essential support staff who worked with the Special Counsel.

Third, the AO speculates that scrutiny of employees' political speech might one day resemble the scrutiny of the Judicial Conference's Code of Conduct Committee after it proposed guidance about judges' membership in the American Bar Association, the American Constitution Society, and the Federalist Society. Before that proposal was abandoned, a congressman questioned the "biases and motivations of the opinion's drafters" — but he asked about the committee members' membership in those groups, not their political affiliations.[7] More importantly, those committee members were judges, not AO employees. That is why, as the AO recognizes, criticism of the committee's guidance focused on the judges' backgrounds, not the AO employees who assisted them.[8] And even if we assume that the AO can limit the off-duty political speech of employees who make policy recommendations to that committee, it is not "reasonably necessary" to impose the same limits on AO employees whose

fodder . . . although the articles of impeachment . . . largely overlooked" it).

[7] Appellant's Brief at 37 (quoting Letter from Rep. Jim Jordan to Sheryl Walter (May 18, 2020), https://republicans-judiciary.house.gov/wp-content/uploads/2020/05/2020-05-18-JDJ-to-Judicial-Conference-re-Draft-Advisory-Opinion.pdf).

[8] Appellant's Brief at 36 (One article cited "the fact that a judge on the committee had donated (prior to joining the bench) to a Senator who had spoken out on the issue.").

work is nothing like that. *National Treasury Employees*, 513 U.S. at 474.

2

The AO also argues that if Congress learns of AO employees' political views, it will have less faith in the employees' ability to be neutral messengers for the Judiciary.[9]

The AO has identified no other case that has considered the weight of the AO's concern for the Judiciary's relationship with Congress. That relationship is undoubtedly important. The Judiciary relies on Congress for essentials like funding, the creation of judgeships, and the construction of courthouses. And Congress looks to the Judiciary for advice on subjects like death-penalty reform, the propriety of nationwide injunctions, and other court-facing issues.

But even assuming the AO's new ban on off-duty political speech is defensible when applied to employees who work with the other branches, the AO has offered no reason to think that most of its employees do such work. Instead, the AO censored all of its 1,100 employees because it says that "it is difficult to predict with certainty which AO employees will be required, as part of their job responsibilities, to represent the Judiciary to the other branches of government." JA 142 ¶ 21.

That difficulty does not satisfy the AO's "heavy" burden. *National Treasury Employees*, 575 U.S. at 466; *cf. Janus*, 138 S. Ct. at 2477 (logistical concerns about preventing free riders could not justify a "heavy burden" on "First Amendment

---

[9] Although the AO also mentions its relationship with the Executive Branch, it offers little explanation of, or argument about, that relationship. So like the AO, we will focus on Congress.

interests"). Some employees who will appear before Congress are obvious. For example, the Office of Legislative Affairs "carries out the Judiciary's legislative liaison activities with Congress and other government entities." JA 138, ¶ 14.d. Perhaps the AO can impose its new rule on employees there who might one day meet with members of Congress or their staffs. But many other employees — like Guffey and Smith — have no reason to think that they will ever interact with Congress. Censoring their off-duty political speech is not "reasonably necessary" to address the AO's concern for the Judiciary's relationship with the other branches. *National Treasury Employees*, 513 U.S. at 474.[10]

3

The AO's last concern is that judges will not trust AO employees who engage in partisan political expression while off-duty. But even assuming that judges will learn of AO employees' private activity, this concern is implausible.

The AO's argument focuses on the 30 or so employees who advise judges on sensitive matters like recusals and participation in outside activities. That alone indicates that imposing the restrictions on all 1,100 AO employees — from the HR professional who processes a travel reimbursement to the IT-help-desk worker who assists a judge with a forgotten password — is not "reasonably necessary to protect the

---

[10] Of course, none of this should be read to imply that any AO employee's work is more important than any other's. We are simply highlighting the disconnect between the speculative threats that the AO identified and the work that most of its employees do. All AO employees provide the Judiciary essential and much appreciated support.

efficiency of the public service." *National Treasury Employees*, 513 U.S. at 474.

Even as to those 30 employees, though, there is some reason to doubt the foundation of the AO's predicted harm. It conflicts with "the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants." *National Treasury Employees*, 513 U.S. at 476. And we have no reason to doubt the AO when it tells us that its employees fit that bill by performing "their job duties and tasks without regard for partisan considerations." R.24-1 ¶ 28.

### III

The above analysis applies equally to all nine speech restrictions, from publicly stating political opinions to organizing political events. But the district court treated two of those nine restrictions differently: driving voters to the polls and organizing events for a partisan candidate. *Guffey*, 459 F. Supp. 3d at 251. That differential treatment turned largely on the district court's belief that the Supreme Court's approval of similar restrictions on Executive Branch employees in the Hatch Act "strongly supports their legality" here. *Id.* at 252.

Although the district court's analysis was thoughtful and thorough, we disagree.

In the Hatch Act context, the Court held that speech restrictions were justified by a federal interest in ensuring "that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine." *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 565 (1973). Importantly, Congress sought to protect employees from "pressure and from express or tacit invitation to vote in a

certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.* at 566. It had extensive evidence of such pressures. *See, e.g.* 84 Cong. Rec. 9598 (1939) (statement of Rep. Taylor) (describing Works Progress Administration supervisors forcing WPA workers to place part of their paycheck "under the Democratic donkey paperweight" on their supervisor's desk).

Thus, the Hatch Act's restrictions passed muster because they "aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights." *National Treasury Employees*, 513 U.S. at 471. That is not the case here. The AO makes no claim that its censorship protects its employees' rights. Instead, the AO restricts its employees' expression to fend off speculative harms to its own operational interests. So the Hatch Act's balance between employees' speech rights and protecting employees from political pressure offers little guidance here.

Absent the belief that precedent directs it, there is no reason to treat driving voters to the polls and organizing political events differently from the other seven prohibited modes of political expression. They all implicate core First Amendment rights. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). And, again, the AO has failed to show that they present any non-speculative threat to its operations.

IV

We turn now to the scope of relief. The district court reasoned that because analyzing a prospective restriction on employee speech "requires the court to go beyond the facts of the particular case before it," granting an injunction to all AO employees was appropriate. *Guffey*, 459 F. Supp. 3d at 256

(quoting *Sanjour v. EPA*, 56 F.3d 85, 92 (D.C. Cir. 1995)). But the analysis of a right and the choice of a remedy are distinct concepts. *Brown v. Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014).

That's why, in applying the same test in *National Treasury Employees*, the Supreme Court still emphasized the age-old principle that "we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." 513 U.S. at 478. Applying that principle makes especially good sense here — the AO may believe that employees who do different jobs than Guffey and Smith should be subject to different restrictions. We cannot assess that belief on the record before us. And an injunction that applies only to Guffey and Smith will fully protect their rights. That narrower remedy is therefore the right one.

Further, the AO is a government entity with an independent duty to uphold the Constitution. We trust that upon receipt of our judgment, it will reconsider the contested restrictions for employees whose work is comparable to (or less sensitive than) the work Guffey and Smith do.

\* \* \*

The AO wants to maintain the Judiciary's reputation for independence from politics. That is among the worthiest of goals. And no one in this case takes issue with the AO's longstanding prohibition of political speech by its employees when they are at the office. But the AO cannot prohibit political speech by Guffey and Smith when they are away from work and in no way affiliating themselves with the Judiciary.

We affirm the district court's grant of summary judgment to Guffey and Smith, but we limit its injunction against the first

seven restrictions to apply only to Guffey and Smith. We reverse its grant of summary judgment to the AO on the other two restrictions, and we remand for it to enjoin their application to Guffey and Smith as well.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting: I agree with my colleagues that Lisa Guffey and Christine Smith both have a strong interest in freely participating in the political process, a right fundamental to our democracy. *See McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion). And few, if any, could deny that the challenged restrictions on the partisan political activities of Administrative Office of the United States Courts (AO) employees encroach on that right. On the other side of balance, however, is the "genuine and compelling" interest in safeguarding the "public perception of judicial integrity," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446, 447 (2015), "a state interest of the highest order," *id.* at 446 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)). "The guarantee of an independent, impartial judiciary enables society to 'withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.'" *Republican Party of Minn. v. White*, 536 U.S. 765, 804 (2002) (Ginsburg, J., dissenting) (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943)); *see also United States v. Will*, 449 U.S. 200, 217–18 (1980) ("A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government."). With neither "sword" nor "purse" to safeguard its independence, *see* The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961), the Judiciary's position of authority within our constitutional framework "depends in large measure on the public's willingness to respect and follow its decisions," *see Williams-Yulee*, 575 U.S. at 445–46. Yet recent evidence indicates that public confidence in the Judiciary is in decline. *See* Brandon L. Bartels & Christopher D. Johnston, *On the Ideological Foundations of Supreme Court Legitimacy in the American Public*, 57 Am. J. Pol. Sci. 184, 185–86 (2013) ("[I]ndividuals grant or deny the [Supreme] Court legitimacy based on the ideological tenor of the Court's" decisions.); *see*

*also* Megan Brenan, *Americans' Trust in Government Remains Low*, Gallup News (Sept. 30, 2021).[1]

In revising its employees' code of conduct to impose the nine challenged restrictions on partisan political conduct,[2] the AO has attempted to safeguard this vital faith in the Judiciary as a body of independence and impartiality. Yet the majority gives short shrift to its attempt. Because I find the AO has adequately justified its restrictions, as required under *United States v. National Treasury Employees Union* (*NTEU*), 513 U.S. 454 (1995), I would reverse the district court's partial invalidation of the restrictions and allow all nine to take effect.[3] Accordingly, and with respect, I dissent.

## I. Administrative Office's Burden

I first depart from my colleagues regarding the AO's evidentiary burden under the *NTEU* framework. As discussed *infra*, the AO need provide only a reasonable ground to

---

[1] *Available at* https://news.gallup.com/poll/355124/americans-trust-government-remains-low.aspx.

[2] The restrictions prohibit AO employees from (1) publicly expressing opinions about partisan candidates or political parties, including on social media; (2) wearing or displaying partisan badges, signs or buttons; (3) contributing money to a party, candidate or political action committee; (4) attending partisan fundraisers; (5) attending a partisan candidate's campaign events; (6) attending party conventions, rallies and meetings; (7) belonging to a partisan political organization (other than registering as a member of a political party for voting); (8) driving voters to the polls on behalf of a party or candidate; and (9) organizing events for a partisan candidate.

[3] I agree with my colleagues that the restrictions precluding AO employees from driving voters to the polls and organizing events for a partisan candidate should not be treated differently from the other seven; all nine rise or fall together. *See* Majority Op. at 15–16.

conclude that the harms it fears will occur. But documentary evidence of past harm is only *one* way to support its restrictions. And precedent like *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), highlights how preserving the perception of judicial impartiality is a compelling interest—one that extends beyond adjudication of discrete cases.

To impose a prospective, generally applicable restriction on employee speech, the government is required to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968)). In other words, the government must show that the harms it aims at are "real, not merely conjectural" and that "the regulation will in fact alleviate the[] harms in a direct and material way." *Id.* at 475 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)). The government must also demonstrate that the restriction's "sweep" is "reasonably necessary to protect the efficiency of the public service." *Id.* at 466, 474.

In support of the challenged restrictions, the AO asserts three interests centered on protecting the perception of the Judiciary as a nonpartisan, impartial body: first, in the public view (Public Perception Interest); second, in the view of members of the two elected branches (Inter-Branch Interest); and finally, in the view of the Judiciary itself (Intra-Branch Interest). *See Guffey v. Duff (Guffey II)*, 459 F. Supp. 3d 227, 236–37 (D.D.C. 2020); *see also* Duff Decl. ¶ 23, Joint Appendix (J.A.) 143. In describing the AO's burden, the district court focused on *NTEU's* requirement that the government's recited harms be "real, not merely conjectural," *Guffey II*, 459 F. Supp. 3d at 241 (quoting *NTEU*, 513 U.S. at

4

475), and concluded that the AO must "point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted," *id.* at 243 (quoting *Guffey v. Duff (Guffey I)*, 330 F. Supp. 3d 66, 76 (D.D.C. 2018)). The district court then seemed to "relax[]" the burden for the Public Perception Interest and allowed the AO to rely on "realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." *Id.* at 244 (quoting *Guffey I*, 330 F. Supp. 3d at 76). It did so in light of *Williams-Yulee's* caution that "the concept of public trust in judicial impartiality 'does not easily reduce to precise definition, nor does it lend itself to proof by documentary record.'" *Guffey I*, 330 F. Supp. 3d at 76 (quoting *Williams-Yulee*, 575 U.S. at 447). But the district court declined to relax the burden for the AO's Inter-Branch and Intra-Branch Interests by limiting its analysis to public trust in the Judiciary's *adjudicative* function and ignoring the Judiciary's administrative role. *See Guffey II*, 549 F. Supp. 3d at 244.

As I see it, the district court imposed too high an evidentiary burden. Notwithstanding *NTEU's* mandate, *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden . . . ."), it does not follow that "real" evidence requires "documentary" evidence in all situations. As the majority rightly notes, *see* Majority Op. at 8, the government's evidentiary burden in the First Amendment context "will vary up or down with the novelty and plausibility of the justification raised." *Shrink Mo. Gov't PAC*, 528 U.S. at 391. This holds true even for restrictions reviewed under strict scrutiny. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) ("[W]e have permitted litigants . . . even[] in a case applying strict scrutiny, to justify restrictions based solely on

history, consensus, and simple common sense." (internal quotation marks omitted) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)); *see also Williams-Yulee*, 575 U.S. at 448 (government is "not require[d] . . . to tolerate . . . *risks*" to public perception of judicial integrity (emphasis added)); *Blount v. SEC*, 61 F.3d 938, 939–40, 943–45 (D.C. Cir. 1995) (applying strict scrutiny to SEC restrictions on municipal finance professionals' campaign contributions to state and local officials but rejecting argument that agency must show "specific instances of quid pro quos").

In *NTEU* itself, the Supreme Court, after referencing the "real, not merely conjectural" harm requirement, noted that the government can rely on the fear or risk of harm so long as there is "'reasonable ground to fear that serious evil will result if free speech is practiced.'" 513 U.S. at 475 (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring)). Similarly, in *Weaver v. United States Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), we upheld a policy requiring prepublication review of employees' "speaking, writing, and teaching material on matters of official concern" in furtherance of the agency's "compelling" interest in safeguarding classified information, *id.* at 1431, 1441 (internal quotation marks omitted), without requiring documentary evidence of past harm. Instead, the agency supported its review of speech by personnel without direct access to classified information via an affidavit explaining that such employees may unknowingly come into contact with classified information. *Id.* at 1441.[4]

---

[4] Granted, in *Weaver* we upheld a *review* of employee speech, not an outright prohibition, in order to avoid "constitutional difficulties." 87 F.3d at 1440. *Weaver* nevertheless indicates that simply invoking the *NTEU* test does not suffice to make documentary evidence necessary.

*Williams-Yulee* is the Supreme Court's most recent elaboration on the governmental interest in preserving confidence in the Judiciary. *Williams-Yulee* involved a provision of the Florida Supreme Court's Code of Judicial Conduct that forbade elected judges from personally soliciting campaign funds. 575 U.S. 439–40. The Court upheld the restriction, recognizing that "public perception of judicial integrity is 'a state interest of the highest order.'" *Id.* at 446 (quoting *Caperton*, 556 U.S. at 889). Important here, the Court observed that, although "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," the need to safeguard that confidence "is genuine and compelling." *Id.* at 447. There, the Court applied strict scrutiny—a standard of review higher than that applied in *NTEU*—but did not require documentary evidence of past harm. *Cf. Williams-Yulee*, 575 U.S. at 447–48 (government is "not require[d] . . . to tolerate the[] *risks*" to public perception of judicial integrity (emphasis added)).

The district court limited *Williams-Yulee* to the AO's Public Perception Interest and to the Judiciary's adjudicative function, *see Guffey II*, 459 F. Supp. 3d at 243–44, but I believe that limitation is unwarranted. There is little reason to think that the AO's interests in preserving the Judiciary's reputation for impartiality among members of the elected branches—with which it routinely interacts—as well as within the Judiciary and its Administrative Office *inter se* are any less compelling or less susceptible of "precise definition" than preserving its reputation with the general public. *Williams-Yulee*, 575 U.S. at 447. Further, I doubt that public perception can be isolated from elected officials' perception. The latter are elected, and therefore influenced, by the former. *See McCutcheon*, 572 U.S. at 227 (plurality opinion) ("Representatives are not to follow constituent orders, but can be expected to be cognizant of and

responsive to those concerns. Such responsiveness is key to the very concept of self-governance through elected officials."); *cf. Gravel v. United States*, 408 U.S. 606, 661 (1972) (Brennan, J., dissenting) ("The dialogue between Congress and people has been recognized, from the days of our founding, as one of the necessary elements of a representative system."). And political conflicts within and between governmental branches and institutions necessarily spill into the public sphere. *See generally* David R. Mayhew, *America's Congress: Actions in the Public Sphere, James Madison Through Newt Gingrich* 1–28 (2000).

Moreover, although *Williams-Yulee* does not speak to the Judiciary outside its adjudicative function, or to its relationship with the Congress, other decisions do. For example, in *Mistretta v. United States*, 488 U.S. 361 (1989), the Supreme Court considered the propriety of federal judges' membership on the United States Sentencing Commission—what the Court deemed "judiciary involvement in the making of policy"—and whether participation in *policy-making* risked "undermin[ing] public confidence in the disinterestedness of the Judicial Branch," *id.* at 407. The Court has also considered how its "exercise of judicial power"—its adjudicative function— "affects relationships between the coequal arms of the National Government," aware that "when employed unwisely or unnecessarily," that power can pose a "threat to the continued effectiveness of the federal courts." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982). This precedent recognizes the Judiciary's awareness of its significant role outside the courtroom. Indeed, the AO regularly interacts with the Congress to secure funding and influence policies affecting the Judiciary, including, *inter alia*, new judgeships, the federal rules of procedure and evidence, federal jurisdiction and pretrial and probationary services. *See* Duff Decl. ¶ 11, J.A.

134–36. The AO has a designated Office of Legislative Affairs to facilitate this relationship, *see id.* at ¶ 14, J.A. 138–39, and former legislative staffers attest to the essential role the AO plays in advocating for the Judiciary and advising the Congress on judicial matters, *see* Cooney Decl. ¶ 9, J.A. 164; *see also* Weich Decl. ¶ 11, J.A. 176–77. Lacking either "sword" or "purse," *see* The Federalist No. 78, at 465, the Judiciary's reputation—and, of necessity, the AO's reputation—for nonpartisanship and impartiality is the currency with which it is able to negotiate on behalf of its interests. No less than with its adjudicative function, the Judiciary's status as a co-equal branch to set its administrative and policymaking priorities "depends in large measure" on the Congress's "willingness to respect" its position as an impartial, nonpartisan branch. *See Williams-Yulee*, 575 U.S. at 445–46. The alternative is a Judiciary "drawn into political disputes with other branches," which serves only to "diminish its legitimacy before [the] general public as well." Appellant's Br. 33; *cf. Valley Forge Christian Coll.*, 454 U.S. at 474 (1982) (Powell, J., concurring) ("[R]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either." (alteration in original) (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring))).

## II. Administrative Office's Interests

The next questions are whether the AO's "recited harms are real, not merely conjectural" and whether the challenged restrictions "will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (quoting *Turner Broad. Sys.*, 512 U.S. at 664).

## A. Public Perception Interest

The AO's Public Perception Interest is premised on the concern that its employees' partisan political activities will undermine the public perception of the Judiciary as an apolitical, impartial body. As the majority notes, the AO has not isolated a specific instance of this fear's materialization. *See* Majority Op. at 10. But here, "materialization" may be provable only by assessing the *risk* of harm. The AO has pointed out instances of entities leveraging the political activities of government employees to impeach their employer's reputation and further a partisan agenda and has submitted affidavits attesting to the risk that similar partisan attacks could be aimed at the AO without the challenged prohibitions. Its showing provides, at least to me, a "reasonable ground" to support the AO's Public Perception Interest, in furtherance of which a ban on partisan political activity is the most "direct and material" means of eliminating that risk. *NTEU*, 513 U.S. at 475 (quoting *Turner Broad. Sys.*, 512 U.S. at 664).

The AO has described instances of opposition research firms and partisan-aligned groups seeking information regarding politically focused emails sent and campaign contributions made by employees of the National Oceanic and Atmospheric Administration, the Environmental Protection Agency and the Internal Revenue Service—information sought in order to cast doubt on the reputation and policies of the employing agency. *See* Appellant's Br. 41; Appellant's Reply Br. 20–21; *see also*; Phillip Bump, *What campaign contributions tell us about the partisanship of government employees*, Wash. Post (Dec. 27, 2018)[5]; Timothy P. Carney,

---

[5] *Available at* https://www.washingtonpost.com/politics/2018/12/27/is-trumps-dismissal-unpaid-government-employees-democrats-accurate/.

*The IRS Is Deeply Political—and Very Democratic*, Wash. Exam'r (May 15, 2013).[6] It did not matter to these entities whether the targeted employees in fact wielded any significant influence in the policy matters at issue. Similarly, it does not matter if a particular AO employee lacks significant power over the AO's policy-making functions or the Judiciary's adjudication of cases, *see* Majority Op. at 9–10, as the AO itself, through its employees, routinely engages in potentially contentious debates relating to the nation's judicial system, *see infra* p. 13–14.

The AO's examples track with its submitted declarations, including one from a lobbyist and former congressional staffer who attested that he was "aware of firms whose business models include the dissemination of this type of political information in order to seek to portray particular groups or individuals as supporting or opposing a particular partisan agenda." Cooney Decl. ¶ 16, J.A. 168. This information, the lobbyist noted, can then be packaged and presented "to a media organization or publication for dissemination to the general public." *Id.* If this sort of targeted aggregation and dissemination of political activity routinely occurs with executive-branch employees and agencies, it is no stretch to conclude it can—and will—happen with AO employees.

The district court nevertheless faulted the AO's hypotheticals premised on these sorts of partisan attacks for being based on an untenable chain of inferences:

> [M]embers of the public would [1] need to observe an AO employee engaged in partisan activity, [2] somehow come to know that the person in the photo or social media post is an

---

[6] *Available at* https://www.aei.org/articles/the-irs-is-deeply-political-and-very-democratic/.

11

AO employee, [3] understand that AO employees work with federal judges, [4] but mistakenly believe that they play a role in handling individual cases, and [5] assume—based on ordinary expressions of political preference—that the AO employee is so politically biased that she would be willing to violate her professional ethical obligations by attempting to sway the outcome of a case.

*Guffey II*, 459 F. Supp. 3d at 249. The majority in effect echoes the district court. *See* Majority Op. at 10 (labeling the assumptions "novel, implausible, and unsubstantiated").

Assuming *Williams-Yulee* should not be limited to the Judiciary's adjudicative function as opposed to its administrative and policy-making functions, *see supra* p. 6–8, I believe the chain of inferences is not implausible. For one thing, not all members of the public are neutral observers and we cannot ignore that partisanship is an unavoidable fact of 21st-century society. For another, to identify an individual who engages in political expression as an AO employee is not difficult for an even mildly motivated actor. Individuals, including government employees, regularly post their headshots and job titles on networking websites like LinkedIn. Further, the increased use of "doxxing"—"publicly identify[ing] or publish[ing] private information about (someone) especially as a form of punishment or revenge"[7]—makes public identification of a person all the more likely. *See* Nellie Bowles, *How 'Doxxing' Became a Mainstream Tool in the Culture Wars*, N.Y. Times (Aug. 30, 2017)[8]; *see also*

---

[7] *Dox*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dox (last visited July 25, 2022).

[8] *Available at* https://www.nytimes.com/2017/08/30/technology/doxxing-protests.html.

Callum Borchers, *Doxxed Trump Donors Have an Unlikely Defender in this Democratic Congressional Candidate*, Wash. Post (Apr. 30, 2017) (highlighting Twitter account tweeting "the names, hometowns, occupations and employers of people who contributed . . . to [former President] Trump's campaign").[9] As a more concrete example, an individual's political contributions, alongside his employment information, is publicly available through the Federal Election Commission's database. *See* Cooney Decl. ¶ 16, J.A. 168–69; Weich Decl. ¶ 18, J.A. 180; *see also* Federal Election Comm'n, *Campaign Finance Data* (last visited July 25, 2022).[10] Finally, once a motivated actor compiles the identifying information, is it likely he/it will pause to learn whether those AO employees are in fact involved in the Judiciary's adjudicative function before packaging the information for consumption by media and the general public? These examples involving executive-branch employees indicate that hesitation is unlikely.

To the extent the chain of inferences is deemed implausible because the AO is a small or unfamiliar office, *see* Appellees' Br. 38–39, this conclusion is also unwarranted. It is far from remote that members of the public might fail to differentiate employees of the Administrative Office *of the United States Courts* from those employees located in courthouses; nor is it implausible for a partisan group to gloss over any such distinction before packaging its message for dissemination to the public, especially given that courthouse employees have long been barred from partisan political activity, *see* U.S. Courts, *Guide to Judiciary Policy*, vol. 2, pt.

---

[9]  *Available at* https://www.washingtonpost.com/news/the-fix/wp/2017/04/30/doxxed-trump-donors-have-an-unlikely-defender-in-this-democratic-congressional-candidate/.

[10]  *Available at* https://www.fec.gov/data/.

A, ch. 3, § 320 (last revised Mar. 21, 2022),[11] making AO employees the sole Judiciary employees who can similarly, if not prohibited, dilute its apolitical essence.[12] Further, the AO as a body is involved in contentious debates related to the federal judicial system—including, but not limited to, new judgeships and judicial vacancies to be filled by the elected branches,[13] pro se litigation[14] and judicial ethics[15]—that have

[11] *Available at* https://www.uscourts.gov/sites/default/files/guide-vol02a-ch03.pdf.

[12] On this point, I note that the restrictions at issue parallel those applicable to federal judicial employees located in courthouses—other than law clerks, who are barred from partisan *and* nonpartisan activity—restrictions that were drafted and approved by a committee of federal judges as well as the Judicial Conference, comprised of federal judges and presided over by the Chief Justice of the United States. *See* Duff Decl. ¶¶ 17–18, J.A. 140.

[13] *See* John Gramlich, *Federal judicial picks have become more contentious, and Trump's are no exception*, Pew Rsch. (Mar. 7, 2018), https://www.pewresearch.org/fact-tank/2018/03/07/federal-judicial-picks-have-become-more-contentious-and-trumps-are-no-exception/ (explaining "rising discord in the federal judicial nominations process"); *see also* Tara Leigh Grove, *Sacrificing Legitimacy in a Hierarchical Judiciary*, 121 Colum. L. Rev. 1555, 1593–96 (2021) (explaining evolving partisan tensions characteristic of federal judicial nominations).

[14] *See* Andrew Hammond, *The Federal Rules of Pro Se Procedure*, 90 Fordham L. Rev. 2689, 2700–02 (2022) (describing opposing public attitudes towards *pro se* litigation—seen as either essential to judicial system or frivolous waste of judicial resources—and Judicial Conference's role in shaping relevant policies).

[15] The AO points to the public scrutiny of a Judicial Conference proposal—with AO support—regarding federal judges' membership in law-related organizations like the Federalist Society and American Constitution Society. *See* Appellant's Br. 36; *see also* Editorial Board, *Judicial Political Mischief*, Wall St. J. (Jan. 21, 2020), https://www.wsj.com/articles/judicial-political-mischief-11579652574; *cf.* Charles G. Geyh, *The Architecture of Judicial*

political aspects and may invite partisan attacks, regardless of the AO's perceived obscurity.

## B. Inter-Branch Interest

Next, I believe the AO's Inter-Branch Interest—that AO employees' partisan political activities will negatively affect the Judiciary's reputation with members of the Congress—is sufficiently grounded in reality.

The AO's evidence shows that the AO's effectiveness as the Judiciary's representative vis-à-vis the elected branches is inextricably linked to its reputation for nonpartisanship. Specifically, the AO provided affidavits from former congressional staffers attesting to the "reputation for non-partisanship and professionalism that the AO and its employees hav[e] built up among members [of Congress] and their staff." Cooney Decl. ¶ 9, J.A. 164; *see also* Weich Decl. ¶ 11, J.A. 176–77 ("In my experience, the AO and its personnel . . . advanced the Judiciary's interests in a qualitatively different manner, without any political or policy agenda other than promoting the administration of justice in federal courts, protecting the Judiciary's independence from the political branches, and upholding the rule of law."). And these same affidavits submit that, if AO employees were perceived to be overtly partisan, the AO's and Judiciary's long-cultivated reputation for nonpartisanship would be jeopardized. *See* Cooney Decl. ¶ 10, J.A. 165 ("Were individual AO employees, or the AO generally, to be perceived as engaged in partisan political activity, I believe it could lead to increased congressional skepticism toward the positions of the AO and the Judicial Conference and possibly to reduced congressional willingness to advance legislation in the best interests of the

---

*Ethics*, 169 U. Penn. L. Rev. 2351, 2353–55 (documenting public debates over judicial ethics).

federal judiciary, all to the detriment of the institution of the Judiciary."); Weich Decl. ¶ 12, J.A. 177 ("It would have been difficult for members of Congress and their staffs, including me, to maintain the perception of the AO and its employees as non-partisan actors if AO employees were known to have publicly engaged in partisan political activity, even in their non-professional capacities."). It is as likely that efforts by partisan-aligned individuals to tarnish the *public* perception of the AO and the Judiciary would similarly affect the perception of members of the Congress and its staff.

Further, the harm resulting from a loss of congressional confidence may be more tangible than that resulting from a diminution of public confidence, as there is substantial and direct interaction between the AO and the Congress. The AO, like any federal agency, depends on the Congress for the latter's approval of its budget and accordingly provides budgetary briefings to congressional members and their staff. *See* Duff Decl. ¶ 14(d), J.A. 138–39; Cooney Decl. ¶ 4, J.A. 155–56. In addition, the AO regularly consults with and testifies before the Congress—sometimes at the Congress's behest—on matters relating to the Judiciary, including proposed legislation on matters ranging from cameras in courtrooms to sentencing reform to new judgeships. *See* Duff Decl. ¶ 14(d), J.A. 138–39; *see also* Weich Decl. ¶ 9, J.A. 175; Cooney Decl. ¶¶ 6–7, J.A. 162–63. It is not implausible to fear, as the AO does, that members of the Congress and their staff, upon learning of AO employees' partisan political activities, will question the neutrality of the AO and the policies it proposes. For example, the Congress may question whether the Judiciary's requests for additional judgeships to address increasing caseloads are in fact intended to benefit the particular political party or candidate that would fill new

judgeships.[16] *See* Baugher Decl. ¶ 10, J.A. 158–59; *see also* Duff Decl. ¶ 25, J.A. 144 (observing political parties' goals of "making Judicial appointments that advance the parties' partisan objectives"). Or legislators may move to delay or reduce the Judiciary's budgetary requests in retaliation for perceived partisanship on the part of the AO in setting its policy priorities. *See* Baugher Decl. ¶ 10, J.A. 158–59. The effectiveness and efficiency of the AO both as advocate for the Judiciary and as neutral advisor to the Congress could be placed at significant risk if its internal administrative and policy aims were hindered by a distrustful relationship with the Congress resulting from AO employees' overtly partisan political activities—and the examples discussed *supra* make this fear entirely plausible.

### C. Intra-Branch Interest

Finally, as with the first two interests, I believe the AO's Intra-Branch Interest—that partisan political activity risks adversely affecting individual judges' perceptions of the AO as an impartial body—is sufficiently grounded to support the challenged restrictions.

The AO serves as the Judiciary's advisor, advocate and administrator, independent of the other branches. *See Chandler v. Judicial Council of the Tenth Circuit of the U.S.*, 398 U.S. 74, 102 (1970) (Harlan, J., concurring) (describing AO as "an arm of the judicial branch of government and under the direct control of the Supreme Court and the Judicial Conference of the United States"). AO employees work closely with scores of

---

[16] Much ink has been spilled to document the rising—and regrettable—politicization of the judicial nomination process, including inferior court nominees. *See supra* note 13; *see generally* Keith E. Whittington, *Partisanship, Norms, and Federal Judicial Appointments*, 16 Geo. J.L. & Pub. Pol'y 521 (2018).

individual federal judges, providing myriad services and support. AO employees provide policy-making support for the Judicial Conference—and its many committees, working groups and advisory councils comprised of federal judges—on subjects like court rules, probation and pretrial services, defender services, PACER access, judicial security and judicial salaries. *See* Duff Decl. ¶¶ 9–10, J.A. 132–34. They also draft proposed legislation, amendments to federal rules of procedure and budgetary proposals. *Id.* at ¶ 11, J.A. 134–36. They manage the mechanisms for filing judicial misconduct and disability complaints and update the codes of conduct applicable to federal judges, *id.* at ¶ 10–11 J.A. 133–36, and supervise and provide guidance regarding federal judges' financial disclosure reports, *id.* at ¶¶ 9, 11, J.A. 132, 134–36. The Judicial Conference provides oversight of AO employees and can make hiring, promotion and assignment recommendations. *Id.* at ¶¶ 11, 13, J.A. 134, 137.

This close working relationship on matters central to the functioning of the Judiciary underscores the necessity of trust. *See* Baugher Decl. ¶ 12, J.A. 160 ("As a longtime employee of the Judicial Branch, I know that the AO's work with judges is built on the understanding and trust that AO employees are offering objective, unbiased advice and assistance to the judges."). Loss of that trust stemming from concerns over an AO employee's political activity risks weakening the core mission of the AO—to provide advice, support and recommendations to and on behalf of the Judiciary. It cannot benefit the Judiciary for judges to question, based on perceived political leanings, the AO employees who provide advice on judges' attendance at seminars organized by outside organizations. *See* Duff Decl. ¶ 33, J.A. 149. Or question the neutrality of AO employees with roles in processing complaints of judicial misconduct. *See id.* at ¶ 134, J.A. 149. Or AO employees assigned to appear before the Congress on

policy matters approved by the Judicial Conference and/or its various committees comprised of federal judges. *See id.* at ¶ 135, J.A. 149–50.

Further, I do not agree with my colleagues' implication that we have to "assum[e] that judges will learn of AO employees' private activity." Majority Op. at 14. With the frequency with which AO employees and federal judges interact—together with the increasing reach of social media, where much political conduct occurs—it is not implausible that judges will learn of a particular AO employee's partisan political activity. *See* Duff Decl. ¶¶ 28–30, J.A. 146–48.

Assuming the AO could properly provide evidence reflecting the views of individual federal judges, as Guffey and Smith suggest, *see* Appellees' Reply Br. 6, it cannot be faulted for declining to do so. I doubt that it is possible to gauge accurately the effect on the Intra-Branch Interest that implementation of the challenged provisions will have, short of perhaps polling substantial members of the federal judiciary, a proposal not only improbable but undoubtedly improper. Nevertheless, the assurance that federal judges have enjoyed for decades that partisanship is absent within the AO will undoubtedly be lost if the challenged restrictions are invalidated.

### III. Sweep of the Challenged Restrictions

Finally, the "sweep" of the restrictions on protected activity must be "reasonably necessary to protect the efficiency of the public service." *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474); *see also Sanjour v. EPA*, 56 F.3d 85, 95 (D.C. Cir. 1995) (en banc) (examining "fit between government's purported interest and sweep of its restrictions" (internal quotation marks omitted)). I doubt my colleagues would dispute that even an employee's routine political activities—

including campaign contributions and social media posts—can be leveraged to mount a partisan attack against his employer. *See supra* p. 9–10. Because I believe all of the outlawed activities under the revised Code of Conduct, if allowed, could threaten the Judiciary's reputation, restricting all such activity is reasonably necessary to protect that reputation.

I find the reasoning relied upon by the district court and offered by Guffey and Smith unpersuasive. First, the district court concluded that the AO failed to demonstrate that the Code of Conduct's existing prohibition on using "position, title, or authority in connection with" partisan political activity, coupled with after-the-fact disciplinary proceedings, is insufficient to address threats to the Judiciary's reputation. *Guffey II*, 459 F. Supp. 3d at 250–51. But that vague proscription does not *specify* prohibited conduct nor provide sufficient means of redress. As the AO points out, disciplinary proceedings would serve only to police "clearly inappropriate conduct" but ignore "normal partisan conduct," like campaign contributions within legal limits or social media posts, both of which can have similarly deleterious effects on the perception of the Judiciary as an impartial, nonpolitical body. *See* Appellant's Br. 56–57; Appellant's Reply Br. 42–45. Further, as the AO notes, an ad hoc disciplinary investigation "may itself be cast as partisan." Appellant's Br. 57; *see also* Cooney Decl. ¶ 18, J.A. 170 ("[I]t is not unlikely that . . . a disciplinary proceeding itself could become politicized by members of Congress who agree with the employee's partisan message and attempt to exploit the AO's disciplinary action as evidence that the AO is itself promoting a particular partisan view.").

Second, the district court found the restrictions underinclusive because they do not resolve the potential consequences of an employee's *past* partisan activity like pre-employment campaign contribution disclosures or social media

posts. *Guffey II*, 459 F. Supp. 3d at 251. But I fail to see how the AO could legitimately police employees' pre-employment activity; further, it is well-settled that the AO "need not address all aspects of a problem in one fell swoop," especially ones unrelated to its employees' conduct while they are employed by it. *Williams-Yulee*, 575 U.S. at 449; *see also Burson v. Freeman*, 504 U.S. 191, 207 (1992) ("We do not, however, agree that the failure to regulate all speech renders the statute fatally underinclusive."). And Guffey and Smith's suggestion that the revised Code of Conduct is underinclusive in that it excludes political activity such as reading political books on the bus or publicly viewing a political film, *see* Appellees' Br. 53–54, is ludicrous on its face.[17]

\*\*\*

In a city that is ground zero for political expression, it may be folly to attempt to restrict—let alone prohibit—it. Notwithstanding the Administrative Office's location, however, the Constitution demands that the apolitical essence of the Judiciary and all members of its workforce—wherever sited—remain uncompromised.

For the foregoing reasons, I respectfully dissent.

---

[17] I find their over-inclusiveness, *see id.* at 50–51, and Hatch Act, *see id.* at 51–52, arguments equally meritless.